OPINION
This case is before us on the appeal of Steven England, M.D., Inc. (England) from a trial court decision dismissing England's claim against Dr. Jay O'Flynn. England's claim was based on a $150,000 promissory note O'Flynn signed when he became associated with England's obstetrics practice. At the time the agreement was signed, Dr. Steven England practiced under the corporate name of Steven G. England, M.D., Inc., and O'Flynn was employed as a solo practitioner in Middletown, Ohio. Dr. England was the sole shareholder in the England corporation.
Several documents were executed as part of the transaction that began the parties' association. These documents included a $150,000 promissory note from O'Flynn to England, an Independent Contractor Agreement (ICA) signed by O'Flynn and England, an agreement executed by O'Flynn, England, and St. Elizabeth Medical Center, and a $150,000 promissory note from England to St. Elizabeth.
Under the terms of the $150,000 promissory note from O'Flynn to England, the principal amount was to be repaid without interest, through application of accounts receivable from O'Flynn's prior medical practice in Middletown, and by payments of $2,000 per month, beginning July 1, 1989. However, the note became immediately payable and due upon certain items of default, including O'Flynn's failure to pay any installment of principal when due. The note also stated that:
 [i]n the event that the Independent Contractor Agreement executed on the 20th day of March, 1986, between Maker and Payee shall be terminated by Maker prior to June 30, 1991, for any reason other than Maker's death or disability, the then outstanding principal balance of this Promissory Note shall immediately become due and payable and such outstanding balance shall immediately begin to bear interest at the rate of eighteen percent (18%) per annum.
The ICA and promissory note were both signed the same day. Under the ICA, which was to last about five years (or until June 30, 1991), O'Flynn was guaranteed a minimum income, as follows: for the first year, $112,500; for the second year, $100,000, plus one-third of O'Flynn's net practice income in excess of $100,000; and for the third year, $110,000, plus two-thirds of O'Flynn's net practice income in excess of $110,000. In the fourth and fifth years, O'Flynn was to be paid the net practice income he generated during each year. Net practice income was defined as O'Flynn's revenues minus his direct and common expenses. Direct expenses were defined as each party's individual direct expenses. Computing "common expenses" was more complicated. Generally, O'Flynn was responsible for one-half of the common expenses of the medical practice, except staff salaries, payroll taxes, medical supplies, and practice management fees. These latter items were allocated as a direct expense to O'Flynn until his gross billings amounted to 40% of the parties' combined gross billings.
The ICA further provided that if one physician performed emergency surgery while "on call," on a patient initiated by the other physician, the on-call physician would receive the revenue from the surgery. However, deliveries were treated differently. Revenue from deliveries was allocated to the initiating physician, not the on-call physician. The ICA also provided that O'Flynn and England would establish an on-call relationship, in which each party would be on call "on a substantially equal basis."
Finally, the ICA stated that the contractual obligations were contingent on: 1) execution of an agreement by St. Elizabeth Medical Center to help fund the $150,000 loan and minimum income guarantees; and 2) termination of an existing agreement between O'Flynn and Middletown Hospital.
In accordance with the above provisions, England, O'Flynn, and St. Elizabeth Medical Center entered into an agreement the same day the promissory note and ICA were signed. St. Elizabeth agreed to loan England (the corporation) $150,000 to fund its obligation under the O'Flynn promissory note. England was to repay the $150,000 to St. Elizabeth, without interest, in monthly payments of $2,000, beginning in July, 1989. Like the O'Flynn promissory note, this agreement stated that the loan amount would be immediately due, and subject to 18% interest, if O'Flynn terminated the ICA with England before June 30, 1991.
St. Elizabeth also agreed to advance England the amount of O'Flynn's direct and common expenses, plus the monthly equivalent of the guaranteed net income, less revenues that O'Flynn generated. In order to collect this amount, England had to provide St. Elizabeth with a monthly accounting of expenses and income. The guarantee was effective for the first three years of the ICA, or through March, 1989.
According to the agreement, O'Flynn could be liable for repaying part of the advances. However, repayment was postponed as long as O'Flynn made substantial efforts toward building and maintaining his practice, maintained an active staff relationship with the Medical Center, and provided the Medical Center with continuing education services. In this regard, the agreement said that:
 If O'Flynn's obligation to repay the Medical Center, as set forth herein, has not commenced within ten years from the end of the Third Contract Year of the Independent Contractor Agreement, then O'Flynn shall have no obligation to repay such amount thereafter.
In contrast, England had no duty under the agreement to repay the advances. Thus, England received money for expenses from St. Elizabeth, but O'Flynn had the obligation to repay the money. Again, the obligations under this agreement were connected to the other agreements, i.e., they were contingent on execution of the England/O'Flynn ICA.
The final document involved was a promissory note from England to St. Elizabeth, in the amount of $150,000. England signed this note on June 3, 1986, or shortly after the parties' association began. Under the terms of the note, England was required to pay O'Flynn's Middletown accounts receivable to St. Elizabeth as they were received. As we mentioned earlier, England was also supposed to pay $2,000 per month beginning July 1, 1989. Like the note signed by O'Flynn, this note provided for immediate acceleration and 18% interest if O'Flynn terminated the ICA before June 30, 1991. However, Dr. England was not personally liable on the note. Instead, the note was made on behalf of the corporation.
Pursuant to the terms of the notes, St. Elizabeth paid England $150,000, and England paid O'Flynn $150,000. England also paid O'Flynn the stipulated guaranteed income, and submitted bills to St. Elizabeth for the guaranteed payment and the expenses of O'Flynn's practice. For example, for April, 1986, England sent St. Elizabeth an account which listed $7,500 for O'Flynn's income guarantee, $14,172.49 in direct expenses, and $3,905.42 in common expenses. Based on $900 in income attributed to O'Flynn for that month, the subsidy requested from St. Elizabeth was $26,677.91. Similarly, the amount of subsidy requested in May, 1986, was about $15,960.
Total listed expenses for Dr. O'Flynn between July 1, 1986, and June 30, 1987, were about $302,165. Similarly, for the nine month period ending March 31, 1988, O'Flynn's listed expenses were about $224,129. These expenses included O'Flynn's share of some unusual items, like $10,000 per month for computer services, accounting services, and practice management. England's office was not computerized at that time. According to Dr. England, the $3,000 was for use of a Mr. Igel's computer service. England also allegedly paid Igel $4,000 per month for practice management and $3,000 per month for accounting services.
O'Flynn's office manager, Mary Larson, worked for O'Flynn before, during, and after his association with England. Larson testified that the highest yearly cost for O'Flynn's practice during all those times would have been about $72,000, including rent. She stated that the $302,165 expense amount was not accurate. Larson also indicated that various listed expenses, including her own salary, were inaccurate. Another employee, Nurse Buckley, worked less than two months, and left the office no later than June, 1986. However, for October, 1986, Buckley's salary was still listed as $1,540 on the expense reports given to St. Elizabeth.
According to Larson, about $42,000 in payments for O'Flynn's Middletown receivables was collected by December, 1986, and was given to Dr. England's office manager to deposit. These receivables were not deposited in Dr. O'Flynn's account. In contrast, Dr. England denied collecting any of the Middletown receivables. However, he did not submit any documents or witnesses to support his testimony. Admittedly, England never forwarded any of this money to St. Elizabeth.
O'Flynn testified that he tried repeatedly to get monthly accounting statements from the practice, but was rebuffed. Finally, he asked St. Elizabeth's comptroller for information and was given the income projections and expense statements submitted by England. At that time, O'Flynn learned that Buckley's salary had been billed as an expense for several months after she was released from employment. O'Flynn was upset when he learned of the financial irregularities and brought them to St. Elizabeth's attention.
An additional point of contention was the on-call situation. Because two doctors were in the practice, each doctor was on call every other day and every other weekend. During each particular twenty-four hour period, the on-call doctor carried a pager or was available by telephone, delivered all babies, took care of all emergencies, and was required to stop and see the other physician's patients.
According to O'Flynn, the on-call time was initially equal. However, very soon into the relationship, O'Flynn did seventy to eighty percent of the call. In addition, after about eighth months had elapsed on the contract, O'Flynn no longer let Dr. England see his patients on call. Instead, O'Flynn took all the call for his own patients. The reason for this is that O'Flynn was concerned about Dr. England's patient care. O'Flynn could not trust Dr. England to examine his patients when he was on call. Instead, Dr. England frequently talked to patients only by telephone or asked other doctors to take call.
O'Flynn objected to this because calling patients by telephone rather than making rounds is not accepted medical practice. Patients were repeatedly upset because they had not been seen by a doctor over the weekend. O'Flynn also did not have confidence in one of the physicians Dr. England asked to cover his calls. And finally, O'Flynn did about sixty to seventy percent of Dr. England's deliveries, i.e., he did a majority of Dr. England's work, without being paid. As we mentioned earlier, payment for deliveries was received by the initiating physician, not by the physician who delivered the baby.
In response to O'Flynn's complaints, Dr. England continued to avoid his on call obligations. Dr. England also responded by recruiting another physician (Dr. Stasney). In this regard, Dr. England arranged for St. Elizabeth to also pay a subsidy for Dr. Stasney's practice expenses for 24 months. In contrast to O'Flynn's subsidy, however, Dr. England had to personally guarantee the obligations of the England corporation, including the obligation to repay the subsidy. Repayment was waived if the number of patients admitted to St. Elizabeth by England, Stasney, and O'Flynn exceeded 95 patients per month. If fewer patients were admitted, repayment was calculated based on a sliding scale.
Even after Dr. Stasney came into the practice, Dr. England did not take substantially the same night call as O'Flynn. Accordingly, O'Flynn left the practice in March, 1989. O'Flynn left because he was concerned about irregularities in the expense reporting to the hospital and about Dr. England's patient care. O'Flynn also left because of Dr. England's failure to comply with the on-call requirements in the contract.
Dr. England testified that he probably took within ten percent of the call that O'Flynn took, exclusive of weekends. He also testified that he did not repay the $150,000 note to St. Elizabeth, nor did he repay any of the subsidy for Dr. Stasney. According to Dr. England, St. Elizabeth did not demand repayment. At some point, England and the hospital had a dispute about a reimbursement request that was not submitted in a timely fashion. This request involved both Stasney's and O'Flynn's practices and amounted to about $190,000. St. Elizabeth did not pay the reimbursement request, and both sides informally decided not to pursue each other. However, Dr. England did not offer testimony or documents indicating what portion of this amount was related to O'Flynn's practice.
After hearing the above evidence, the magistrate and trial court both concluded that O'Flynn was not required to reimburse England for the amount of the promissory note, due to England's material breach of contract. England now appeals, raising the following assignments of error:
I. The lower court erred in concluding Appellee was entitled to a recission of the agreement between the parties based upon a breach of the "on-call" provisions of the agreement.
II. The lower court erred in concluding that improper charges by the Appellant to St. Elizabeth negatively impacted on the Appellee entitling him to relief therefore.
III. The lower court erred in concluding that the agreement between Appellant and St. Elizabeth was connected to the agreement between the Appellant and Appellee, entitling Appellee not to repay his note obligation to Appellant.
After considering the assignments of error, we find them without merit. Accordingly, the judgment of the trial court will be affirmed.
 I
In denying recovery to England, the trial court found that England had breached the "on-call" provision in the ICA, and that the breach was material. The court also found that O'Flynn had just cause for terminating the contract due to his perception of fraudulent billing. In the first assignment of error, England attacks the trial court's "recission" of the contract. Specifically, England claims that the "on-call" provision was not material. England additionally says that recission was improper because O'Flynn did not restore the benefit of the agreement. In other words, O'Flynn did not repay the $150,000, which would have been required to restore the parties to their original positions. And finally, England says that O'Flynn waived recission because he did not plead it as an affirmative defense.
Addressing the latter point first, we note that recission is not specifically included as an affirmative defense under Civ.R. 8(C). However, failure of consideration is listed as an affirmative defense, and was specifically pled by O'Flynn in his answer. O'Flynn also raised the matter of England's material breach of contract in an amended answer. As a result, England had sufficient notice of potential defenses. Wilson v. Kreusch (1996), 111 Ohio App.3d 47, 51.
Regarding the propriety of recission, we note that the magistrate did not rely on recission. Instead, the magistrate found that England's material breach discharged O'Flynn's obligations under the contract. The trial court agreed with this conclusion, but used the term "recission" in its decision.
In Wilson, we said that if a party breaches a material and vital provision of a contract, the other party "may either treat the contract as terminated and rescind it and pursue the remedy that such rescission entitles him to, or he may sue for damages for a breach of the contract." Id. at 56. Generally, a party seeking to rescind must "`place the other in statu quo, by returning all money, property, or other benefits received by him under the contract which is sought to be rescinded, or by making a tender thereof to the other party.'" Miller v. Bieghler (1931),123 Ohio St. 227, 233.
In the present case, in order to return the parties to the status quo, O'Flynn would have had to repay the $150,000 he received. Since England received $42,000 in receivables, that amount would have been credited against O'Flynn's obligations. O'Flynn may have been entitled to a further offset for any improper expenses charged by England, and for any other damages caused by the breach, including damages for the on-call violations. Unfortunately, this type of accounting would be impossible, due to the lapse of time and the lack of written records regarding the on-call obligations. Consequently, recission would not really provide an adequate remedy, even though some exceptions to the tender requirement do exist. For example, tender is unnecessary where it would be a vain act. See, e.g., Gebbie v. Efros (1917), 95 Ohio St. 215, 221-22.
However, although the trial judge incorrectly referred to recission, both the judge and magistrate relied on the same case, i.e., Kersh v. Montgomery Developmental Center, Ohio Dept. of Mental Retardation and Developmental Disabilities (1987), 35 Ohio App.3d 61. In Kersh, the Tenth District Court of Appeals noted that breach of an essential contract term can discharge the obligations of the parties to the agreement. Id. at 62. See also, Russell v. Ohio Outdoor Advertising Corp. (1997),122 Ohio App.3d 154, 159.
The following five factors are used for deciding if a breach is material:
 (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
 (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
 (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
 (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
 (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.
35 Ohio App.3d at 62-63, quoting from Restatement of the Law 2d, Contracts (1981) 237, Section 241.
Under every factor listed, the breach in this case was material. As we mentioned, the ICA required the parties to serve "substantially equal" on-call time. O'Flynn's testimony clearly indicated that this provision was critical. Specifically, O'Flynn testified that he and Dr. England discussed the on-call situation before the ICA was executed. At that time, O'Flynn told Dr. England that "if he was looking for a guy to be his boy and do all his work for him then I wasn't interested. * * * I would, uh . . . be involved if it was a fifty/fifty call situation, and, uh . . . I wasn't interested in being somebody else's boy." In response, Dr. England said, "Oh, great, you know, we'll do it equal and we'll even put it in the contract."
Dr. England did not dispute this testimony. Consequently, O'Flynn reasonably expected the parties to share equal on-call time, but was deprived of his expectation. This was partly a financial deprivation. However, the lost benefit was also non-economic, in that O'Flynn was deprived of personal time during almost three years of the contract. Under the circumstances, the loss was non-compensable and the breach was material. Compare Ward v. Thompkins (Aug. 5, 1993), Cuyahoga App. No. 62387, unreported, 1993 WL 302393, p. 2 (finding breach material and discharging performance where the lost benefit was non-economic and appellee could not be compensated for the loss). See also, Russell,122 Ohio App.3d 154, 158-59 (finding that the right not to be subjected to a potential lawsuit was a reasonable expectation in a lease agreement. Thus, the lessee's failure to remove advertising from a billboard, in compliance with the agreement, was a material breach, since the lessor was, therefore, subjected to a potential lawsuit from an adjoining landowner. Specifically, the lessor and adjoining landowner had entered into a restrictive covenant preventing the lessor from leasing space for billboards).
Based on the above analysis, the first Kersh factor weighs in favor of a material breach of contract. The second Kersh factor involves the extent to which the injured party can be compensated for the loss.35 Ohio App.3d at 62. As we noted, O'Flynn cannot adequately be compensated for the non-economic part of his loss. England suggests that O'Flynn can be compensated for the on-call time, by applying an appropriate hourly rate for the time spent treating England's patients. However, this approach is not feasible, due to the long span of time before suit was brought and the absence of written records for the on-call time.
The third factor is the extent to which the party failing to perform (England) will suffer forfeiture. Id. In this regard, we see no evidence that a forfeiture would occur. As we mentioned earlier, England did not actually contribute any money toward the obligations in the agreement. Instead, St. Elizabeth was the source of the funds that were paid to O'Flynn. Furthermore, although England signed a promissory note to St. Elizabeth, England has never paid St. Elizabeth on the note. As we mentioned, Dr. England claims some type of informal set off in connection with the note and $190,000 in reimbursements for the contracts of Dr. Stasney and Dr. O'Flynn. However, Dr. England did not indicate what part of the alleged set off was due to reimbursements for O'Flynn, nor did he submit any documentation revealing the amounts involved. Therefore, a quite real possibility exists that instead of suffering a forfeiture, England would, in fact, receive a windfall by failing to perform on the contract.
Additionally, from the facts that were elicited at trial, England appears to have already received a windfall, at O'Flynn's expense, and at the expense of St. Elizabeth. As we mentioned, England received reimbursement from St. Elizabeth for O'Flynn's direct and common expenses. However, some listed expenses are questionable at best. In addition to the items already mentioned, we note that the rent on one office was more than doubled (from $1,287 to $2,875 per month) after O'Flynn became part of the practice, with no corresponding change in the physical size of the office. O'Flynn was charged one-half the increased amount, meaning that he would have paid, or St. Elizabeth would have reimbursed England (the corporation) for about $1,437 per month, i.e., an amount exceeding the prior year's total monthly rent. Dr. England also owned one-eighth of the building in which the office was housed. Therefore, a double benefit was received. The corporation benefited first from the subsidy, and then Dr. England benefited again personally. In contrast, the rent on another office not owned by Dr. England stayed the same after O'Flynn entered the practice. When O'Flynn complained to Dr. England about improper expenses being billed to St. Elizabeth, Dr. England laughed and said, "Oh, this is funny money." Dr. England denied making this statement.
As a further matter, England received $42,000 from O'Flynn's Middletown receivables, but never paid any of the money to St. Elizabeth. Although Dr. England denied collecting the receivables, the record contains evidence indicating that England did receive the money. The magistrate and trial judge both specifically found that England had received the $42,000 in receivables. Since these are credibility issues, we defer to the trial court's conclusions. Schafer v. RMS Realty (2000),138 Ohio App.3d 244, 278. Accordingly, there is no basis upon which we could conclude that England would suffer a forfeiture if the contractual obligations are discharged.
The fourth factor concerns the likelihood that the defaulting party will cure his failure. Kersh, 35 Ohio App.3d at 62-63. We agree with the trial court that no chance of a cure exists, since the parties no longer practice together. Finally, the fifth factor assesses whether the party who fails to perform has conformed to standards of good faith and fair dealing. Id. at 63. Based on the record, we think England's conduct was not consistent with good faith and fair dealing.
In light of the above analysis, the trial court did not err in finding that England's material breach of contract discharged O'Flynn from further performance. To the contrary, the court's decision was supported by competent, credible evidence. See, e.g., Board of Com'rs of Clermont County, Ohio v. Village of Batavia (Feb. 26, 2001), Clermont App. No. CA2000-06-039, unreported, 2001 WL 185464, p. 3. Furthermore, while the trial judge may have incorrectly referred to recission, any error was harmless, since the law relied on by both the judge and magistrate supported the judgment.
Accordingly, the first assignment of error is without merit and is overruled.
 II
In the second assignment of error, England claims that the trial court erred in finding that O'Flynn was negatively impacted by the improper charges to St. Elizabeth. According to England, only one simple incident of error occurred, i.e., the October, 1986 charge for the nurse who was no longer employed. England also relies on testimony from O'Flynn, which allegedly indicates that O'Flynn did not know how his reputation had been damaged.
Unlike England, the magistrate and trial judge did not classify improper billing for the nurse as a simple "error." Instead, the magistrate and judge both found that the billing was a fraud perpetrated on the hospital. They both also concluded that the actions of one doctor affected the reputation of all doctors in the firm. As a result, the magistrate and judge decided that O'Flynn was justified in terminating the contract after he learned that improper charges were being made.
We agree with these conclusions. As we noted earlier, questionable expenses were not limited to one nurse's salary for one month. However, even if only one incident of fraudulent billing occurred, O'Flynn was still justified in disassociating himself from such practices. He was not required to wait until the hospital launched an investigation. Furthermore, the fact that St. Elizabeth required a personal guarantee from Dr. England in 1988, in connection with Dr. Stasney's subsidy, indicates actual concern about England's billing practices, and potential damage to the reputation of persons associated with England. Stasney's subsidy agreement also imposed more detailed disclosure of the underlying billing data for Dr. England, Dr. Stasney, and Dr. O'Flynn. As a result, a reasonable observer could conclude that Dr. O'Flynn's reputation was, in fact, being affected by his association with England.
Because the record supports the conclusions of the trial court, the second assignment of error is without merit and is overruled.
 III
The third assignment of error challenges the trial court's conclusion that a connection existed between the various agreements signed by England, O'Flynn, and St. Elizabeth. While England concedes that the agreements refer to each other, he contends that the promissory note is complete and should not be forgiven as the result of any breach of other obligations.
Under established law, a promissory note "may be modified or affected by another writing executed as part of the same transaction." Edward A. Kemmler Memorial Found. v. 691/733 East Dublin-Granville Road Co. (1992), 62 Ohio St.3d 494, 499, citing R.C. 1303.18 (which is analogous to current R.C. 1303.15). "This follows from the general contract principle * * * that writings executed as part of the same transaction should be read together." Id. (citations omitted).
After reviewing the various agreements, we find that they are inextricably intertwined and that the obligation to repay the promissory note was affected by England's compliance with the remaining contractual obligations. Notably, all the agreements were executed as part of the planned professional association between England and O'Flynn. The agreements refer to each other, and the duties are clearly interrelated. For example, England's obligation to pay O'Flynn was contingent on St. Elizabeth's agreement to assist in funding. Therefore, if England failed to receive funds from St. Elizabeth, the loan to O'Flynn would not have taken place.
More significantly, O'Flynn's testimony indicated that the on-call provision in the ICA was a critical consideration during negotiation of the agreements. Had O'Flynn not been assured of equal on-call time, he would not have entered into the ICA and the promissory note obligation would never have arisen. Accordingly, England's breach of the on-call obligation in the ICA caused a failure of consideration. "Failure of consideration exists when a promise has been made to support a contract, but that promise has not been performed. * * * Where a failure of consideration exists, the other party is thereby excused from further performance." Rhodes v. Rhodes Indus., Inc. (1991), 71 Ohio App.3d 797,807 (citations omitted). See also, Southern Floridabanc Savings Assoc. v. Professional Investments of America (Nov. 17, 1988), Cuyahoga App. No. 54683, unreported, 1988 WL 122890, p. 3.
Since the trial court did not err in reading the agreements together, the third assignment of error is without merit and is also overruled.
Based on the preceding discussion, all three assignments of error are overruled and the judgment of the trial court is affirmed.
WOLFF, P.J., and FAIN, J., concur.